## Case No. 15,582.

UNITED STATES v. LEAVENWORTH, L. & G. R. CO.

[1 McCrary, 610:[1] 1 Cent. Law J. 425.]

Circuit Court. D. Kansas. June, 1874.[2]

LAND PATENTS—SUIT TO SET ASIDE—INDIAN LANDS.

1. Where patents for lands have been issued without authority of law, the United States may, in their own name, maintain a bill in equity, in

[1] [Reported by Hon. Geo. W. McCrary, Circuit Judge, and here reprinted by permission.]
[2] [Affirmed in 92 U. S. 733.]

the circuit court, to annul and set aside the patents.

2. On a construction of the treaty of the United States with the Osage Indians, of June 2, 1825 (7 Stat. 240), and the subsequent treaty with the same Indians, proclaimed January 21, 1867 (14 Stat. 687), and of the act of congress of March 3, 1863 (12 Stat. 772), granting lands to the state of Kansas to aid in the building of railroads, *held*, that lands which, under the said treaty of 1825, had been set apart and reserved for the said Indian tribe, and which were in their actual use and occupancy, did not pass under the said railroad grant, and that the United States were entitled to have cancelled patents which had issued to the railroad company under the erroneous assumption that the lands were embraced in the railroad grant.

This is a bill in equity in the circuit court, filed by the direction of the attorney general, to set aside patents issued by the executive officers of the United States to the defendant company. The ground of the bill is that the patents were issued without authority of law and are void. The substantial question in the cause is whether the defendant company is entitled to the land patented to it. The claim of the defendant to the land is under the land grant act of March 3, 1863 (12 Stat. 772), which is in the usual form, and under the treaty of 1865, proclaimed January 21, 1867 (14 Stat. 687), which it is contended ratified or conferred the right. These acts and treaties, so far as material, are referred to in the opinion of the court. The lands in controversy are within a tract thirty by fifty miles in extent, containing about 960,000 acres, and embraced in the counties of Neosho and Labette, and part of the counties of Bourbon, Crawford, Allen, Wilson and Montgomery, in the state of Kansas, and were part of the reservation occupied by the Osage Indians, who have been in possession of it since 1808, until after the treaty of January 21, 1867, when they removed to their new home in the Indian Territory.

By treaty of June 2, 1825 (7 Stat. 240), the Osage Indians, by article 1, relinquished to the United States their title to a large quantity of lands. The second article of that treaty then provides that, "within the limits of the country above ceded and relinquished, there shall be reserved to and for the Great and Little Osage Tribe or Nation, aforesaid, so long as they may choose to occupy the same, the following described tract of land:" (Here describing the reservation.) The above tract of country thus reserved to the Osages, facing on the east fifty miles and running back to the western boundary of the tract described in the first article of the above treaty, continued to be the Osage Indian reservation, and was used and occupied by them as such, and used by the government as provided in the second article of said treaty, until they relinquished their right thereto in 1867. The land in dispute is part and parcel of the reservation described in the second article of the treaty of 1825, and was used and occupied by the Osage Indians

and the government until the treaty of 1865 was proclaimed, which took place the 21st of January, 1867. This last named treaty is dated the 29th of September, A. D. 1865, and was ratified on the 26th of June, 1866, with the addition of certain amendments thereto advised by the senate, and which amendments were accepted by the Indians on the 26th day of September, 1866, and the said treaty was proclaimed by the president on the 21st of January, 1867. There is an express provision in the seventeenth article of the treaty that it shall not go into operation until proclaimed by the president. 14 Stat. 687. The nature of this treaty, and the senate amendment relied on by the defendant, sufficiently appears in the opinion of the court.

On the 10th day of April, 1869, congress passed an act authorizing bona fide settlers upon any lands ceded to the United States by the treaty proclaimed January 21, 1867, to purchase the same in limited quantities, within two years, at $1.25 per acre, whether odd or even numbered sections, saving, however, the legal rights of others. 16 Stat. 55. Under this joint resolution a large number of settlers went on the land, made the required improvements, proved up their settlements before the local office, paid their money and received their certificates of entry. Three hundred and fourteen thousand, two hundred and twenty-eight acres of this land was entered under this joint resolution, and the settlers thereon, in addition to the fees and expenses of entering the same, paid the government therefor the sum of $454,072.10. Nearly all the rest of these lands have been settled upon; some under the joint resolution, by persons who were not able to make payment within the two years it was in force, and others under the belief that the trust specified in the Osage treaty, that these lands were to be sold on the most advantageous terms for cash, would be carried out by the government, and that consequently they would be able to purchase their lands for cash when the government executed the trust. There are between thirty thousand and forty thousand of these settlers upon the land in controversy, who are indirectly interested in the result of the present suits.

The entries of the land under the joint resolution have been ordered to be set aside and cancelled by the secretary of the interior, on the sole grounds that these railroads had a prior grant of these lands. They have nearly all been cancelled, and are being cancelled as they are reached in the regular course of business in the land department. The interior department at different times has been divided in opinion whether the railroad grants include the land in question.

Geo. R. Peck, U. S. Dist. Atty., Wilson Shannon, and McComas & McKeighan, for the United States.

S. O. Thatcher, T. C. Sears, and N. T. Stephens, for defendant.

Before MILLER, Circuit Justice, and DILLON, Circuit Judge.

MILLER, Circuit Justice. This case, with that of the same plaintiffs against the Missouri, Kansas & Texas Railroad Company, is submitted to the court on the bills, answers, replications, documentary evidence, and agreed statements of facts. The facts are undisputed, and without complication. The questions to be considered are exclusively questions of law.

The bill is filed by the United States, under the direction of the attorney general, to set aside and annul certain patents for lands, issued to the defendant by the secretary of the interior; on the ground that they were issued without authority of law. The case of U. S. v. Stone, 2 Wall. [69 U. S.] 525, is conclusive, so far as any authority is necessary, of the right to the relief sought, if this statement be true.

The defendant, a corporation which has built a road through the lands in controversy, and received of the United States the patents which are assailed in the bill, asserts the validity of these patents under an act of congress of March 3, 1863, and the treaty with the Osage tribe of Indians, proclaimed January 21, 1867.

In addition to the very able oral arguments on both sides at the bar, and the printed arguments of counsel engaged in the present case, there have been filed copies of printed arguments before the secretary of the interior, which show that his action in issuing the patents was not hasty, or wanting in reflection, but was the result of deliberate judgment after hearing counsel. This circumstance is not without embarrassment in the minds of the court now called on to consider the same question. But the constitutional adviser of the government, the attorney general of the United States, has felt it to be his duty to ask for a cancellation of these patents, and, as the only question raised is upon the proper construction of the act of congress and the treaty aforementioned. it is eminently a judicial one, which the court cannot avoid, or decline to decide; how high soever may be its respect for the decision of the department of the interior.

The act of congress referred to, found in 12 Stat. 772, by its first section, grants to the state of Kansas, for the purpose of aiding in the construction of certain railroads and branches, every alternate section of land designated by odd numbers. for ten sections in width on each side of said road, and each of its branches.

The road, so far as the matter now in issue is concerned, is described in the act as one from the city of Leavenworth. by way of the town of Lawrence and the Ohio City crossing of the Osage river, to the southern line of the state, in the direction of Galveston Bay, in Texas. This description would carry the road through a large body of land, then in the peaceful possession and occupancy of the tribe of Osage Indians, lying within the border of the state of Kansas. By a treaty between the United States and this tribe, made September 29, 1865, before the line of said railroad was located,.the tribe ceded to the United States a large body of lands, embracing those in controversy.

The first question, therefore, which presents itself for solution, is whether the grant of lands, as made by congress in 1863, includes the lands then held by the Osage Indians, by the ordinary tenure by which Indian tribes hold lands in the United States, but afterwards ceded by treaty to the government. I say, by the ordinary tenure by which Indians hold lands, because 1 do not find anything in the language of the treaty of 1825 with that tribe which changes the nature of their title.

Counsel for defendants have supposed that in considering the effect of the grant under the act of 1863 upon these lands, a material consideration, favorable to their claims, is that the grant is to be construed with reference to the condition of the title of these lands when the line of the road was located and adopted by the company. This argument is based upon what must be conceded to be true, that the particular congressional subdivisions of alternate sections of odd numbers which are to constitute the specific lands granted by the act, must be determined and can only be determined by the location of the line of the road, by an actual survey, showing its relation to those sections. The counsel have, therefore, argued with much force that the act of congress is not a grant in presenti, but a grant in futuro, and that as the particular sections granted must await the location of the road to determine where they would fall, therefore that time, and that location, must govern or be looked to as governing all other considerations bearing upon the extent or limits of the grant.

This proposition, however, is obviously unsound, in view of the general course of the road established by the grant. It must be a road from Leavenworth to the southern boundary of the state, in the direction of Galveston Bay, in which Lawrence and the Ohio City crossing are points and the lands upon which it must operate; or, in other words, the general location and character of the lands which may be taken under the grant, are either definitely laid down in the act, or are to be inferred from considerations existing at the time the act was passed. And this is true, whether in technical language we call it a grant in presenti or a grant in futuro. In point of fact it has some of the characteristics of both classes of grants.

As these lands, though then in possession of the tribe, are in the line of the proposed road, and between Leavenworth and the southern boundary of the state, they are lands within the general descriptive terms of the grant, unless they are excepted out of them by other

parts of the act, or by other paramount considerations.

I am of opinion that on both these grounds the act cannot be held to include these lands.

When the act was passed the lands were, and had been for a very long time, in the peaceful and undisputed possession of the Osages. And though the treaty of 1825 between them and the United States did not so far vary their tenure as to give them a fee simple title, or, indeed, anything but a usufructuary right, it did guaranty to them the exclusive possession and use of these lands "so long as they may choose to occupy the same." This treaty was in full force when the act under which defendant claims was passed, and it is not believed that at that time any proposition to relinquish this possession had been made by the tribe, or any effort by the United States to induce them to do so. To hold, then, as argued by the defendants, that whenever they might choose to locate the line of their road through the Indian Territory, the title to the land, with all that full title implies, passed to them by virtue of this act, so far as odd sections for ten sections in width on each side would go, is to hold that congress had violated this treaty provision, had disregarded the generally conceded rights of Indians in such lands, and had authorized a gross injustice to a feeble and ignorant ward of the government. For if the lands were subject to the grant at all, it must be admitted that no provision whatever is made in the act for the protection of Indian rights, nor even for delay in enforcing the title thus passed to defendants.

When I consider that in the many grants of this character made by congress they have never, unless in this case, intended to include lands which, by treaty, or any other contract, or indeed any other equitable consideration, they should not grant, I can hardly believe that they intended, by the use of general terms necessary to a description of the route of the road, to grant away the lands which by all these considerations they were bound to retain within their own control.

In saying this, I do not consider the question of the power of congress over lands thus situated. I consider only the question of intent, of the actual will of the legislative body, which they designed to put into the form of a statute. It is this, as in all cases of construction, which must govern; and if it were a question now for the first time presented to my consideration, on these general words of description alone, in the grant, I do not see how I could hold that congress intended to include these Indian lands.

But the case does not rest on these general words of description alone. This was by no means the first act of congress donating lands to aid in construction of railroads. Millions of acres had been previously granted for the same purpose, and so many statutes of that kind had been passed, that the language in which the grants were made had become reduced to settled formulæ, and one of these formulæ designed to protect rights previously acquired, as found in every other statute of a similar character, is found in this. It is in the shape of a proviso to the granting section, in the following words:

"That any and all lands heretofore reserved to the United States by any act of congress or in any other manner, by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said road and branches through such reserved lands; in which case the right of way only shall be granted, subject to the approval of the president of the United States."

It will be thus seen that from the operation of this act, as of all others of like character, and by the settled policy of the government, there is excepted any and all lands which, by act of congress, or in any other manner, by competent authority, for any purpose whatsoever, is reserved to the United States.

I cannot adopt the criticism of distinguished counsel, that the exception here provided for is limited to lands set apart and reserved for some special use which the government of the United States may have for them. These acts are all dealings with lands which belong to the United States—lands over which its ownership and dominion are absolute. There is no occasion, therefore, to make of such lands a reservation for the benefit of the United States. But there were many cases in which, while retaining the title, the government, by some of its branches, had set apart, had reserved for special uses of others, and for other uses than those of the government, lands of the United States. Such is the construction placed upon this clause in the cases of Wolcott v. Des Moines Navigation Co., 5 Wall. [72 U. S.] 681, and fully reconsidered and adopted in the more recent case of Williams v. Baker, 17 Wall. [84 U. S.] 144. Can it be said, with any show of reason, that the lands under consideration in those cases, which were withdrawn from sale by reason of the disputed claims of the state of Iowa, were reserved to the use of the United States?

If, however, this criticism has any just foundation in its application to the general clause of exception founded in this and in all other land grants, it cannot affect the present grant; for in proceedings for the probable failure of the grantee, from various causes, to obtain all the odd sections on each side of the road within the prescribed limits, by giving other land in place of them, among the causes of such failure are mentioned previous sales, or grants, homestead rights, "or that the same has been re-

served by the United States for any purpose whatsoever." Now if the solemn covenant in a treaty made by the United States with a tribe of Indians, that these lands "shall be reserved to and for the Great and Little Osage tribes or nations aforesaid, so long as they may choose to occupy the same," is not a reservation by the United States for another purpose than building railroads, it is difficult to comprehend the use of language or what kind of reservation that clause was meant to cover.

I am, therefore, of opinion (1) that, by the necessary outlook at the condition of this land when the grant was made, and the gross violation of justice and solemn treaty rights in the Osages which a grant so construed necessarily implies, congress did not intend to include these lands in the grant; and (2) that in each of the two clauses reserving lands from the operation of the act they have by apt words expressed the intention that these lands should not be included in the grant.

The treaty with the Osage Indians, of which we have been speaking, contains a clause which is relied on by defendants as sufficient to remove any doubt which may arise from the foregoing views, and I now come to consider that branch of the subject. By the first section of that treaty as originally negotiated and signed on the 29th day of September, 1865, the Osages sold to the United States that part of their lands which includes the land now in controversy, with others. And in consideration of this grant and sale to the United States, the government agreed to pay the sum of $300,000, to be placed to the credit of the tribe, in the treasury of the United States, and that interest thereon at the rate of five per cent. per annum should be paid to the tribes. The lands were to be surveyed and sold for cash as public lands are surveyed and sold under existing laws. After reimbursing the United States, the cost of survey and sale and the sum of $300,000 above mentioned, the remaining proceeds of sale were to be placed in the treasury to the credit of the civilization fund, to be used under the direction of the secretary of the interior, for the education and civilization of Indian tribes residing within the limits of the United States.

When the treaty was under consideration in the senate, that body made numerous verbal amendments, and among others not merely verbal, they inserted after the word "laws" the words, "including any act granting lands to the state of Kansas in aid of the construction of a railroad through said lands." To this amendment, made June 26, 1866, the Indians consented. So that this part of the treaty, as finally proclaimed January 21, 1867, reads as follows:

"Said lands shall be surveyed and sold under the direction of the secretary of the interior, on the most advantageous terms for cash, as public lands are surveyed and sold under existing laws, *including any act granting lands to the state of Kansas in aid of the construction of a railroad through said lands,* but no pre-emption claim or homestead settlement shall be recognized." 14 Stat. 687.

The phrase thus inserted and here italicised, is supposed by the defendant's counsel to have reference to the lands now in controversy, and to have the effect of subjecting them to the railroad grant. The difficulty of determining what is their precise meaning in the connection in which they are employed, is very great. As regards their influence on the decision of the question before us, they may be, or rather must be, considered in one of these lights: (1) As granting by treaty, and by force of their own meaning, lands to aid in the construction of this railroad which had not been so granted before. (2) As placing, by means of a treaty with these Indians, a construction upon the doubtful language of the act of congress which we have already considered. (3) As a recognition, by competent authority, of the existence of such a grant, which must necessarily be the act aforesaid.

1. The first of these propositions is wholly inadmissible. Conceding the doubtful proposition that it was within the power of the president and senate and this tribe of Indians, without the assent of the house of representatives, to have appropriated these lands to such a purpose, they have expressed no such intention. Whatever the language may or may not mean, it is clear that it was not intended to go beyond existing laws. It did not design to make any new law or confer any new right.

2. Nor is it easy to believe that the senate of the United States would undertake, in a treaty with Indian tribes, to construe an act of congress. If they did, they certainly could intend to go no further than to express their own understanding of the meaning of the statute, without designing to give to that expression the authority of a legislative construction. Neither the senate alone, nor in conjunction with the president, is authorized to construe acts of congress so as to bind the legislative and judicial departments of the government. In saying this it is not intended to deny that any contract in such a treaty, by which rights are conferred on either party to the treaty, based upon a construction of an existing act of congress, may be valid, and the contract be construed as it was understood by the parties. But in this case neither the state of Kansas nor the defendant corporation were parties in the treaty, nor was it the purpose of the treaty as amended, to confer any new right on these or either of them. Nor do the words inserted, or the language of the treaty as amended, imply any intention to construe the act of congress granting lands to this road. The act is not recited or referred to, except inferentially. No doubt or

question of its construction is raised or decided. If referred to at all, it is hypothetically, as "any law granting lands to aid in constructing a railroad through said lands." Of course, if there was no such law, this treaty did not undertake to make one.

3. But the force of this phrase in the treaty must rest on the third proposition I have suggested, namely, that it is a recognition of the act we have been considering as a grant of these lands. I have no hesitation in expressing my belief that the senator, whoever he may have been, that suggested that amendment, had in his mind the act which we have already construed, and that his purpose was to incorporate into the treaty a recognition of the validity of the grant, so that the treaty should not defeat it. There may have been in his mind, there probably was, a doubt of the right of congress to make such a grant in the face of the treaty of 1825. The treaty now under consideration, originally presented to the senate, provided for the sale of all these lands, and for the disposition of all the money arising from such sales, in a manner inconsistent with such a grant. With these two treaties staring him in the face, he must have felt the doubt whether the grant, even if by its terms it had included these lands, would be upheld as valid. To remove the argument which might be drawn from this treaty as originally made, it was easy to induce the senate and the Indians to recognize any right which may have been acquired by that act, or any other which was an existing law when the treaty was ratified by the senate. In consenting simply to this, the senate would feel that no wrong was done, because no new right was conferred by or concealed in the amendment. At the same time, as the new words introduced designated no specified statute or law, the attention of the senate was not, probably, directed to this particular statute. But as no other law was then in existence, so far as is shown to us, which, by remotest inference. granted lands to aid in constructing a road through these lands, I must believe that the framer of the amendment had this one in his mind.

The true intent and meaning of the clause in the mind of the senate seems to have been this: That, as the treaty directed all these lands to be sold. and made provision for the disposition of all the proceeds, and, as it was suggested that there might be a railroad grant or grants which covered some of the lands thus directed to be sold. this provision was inserted to remove or prevent a conflict between the treaty and the statute. if any such existed.

But this provision. intended to prevent the treaty from defeating the statute. if such existed. is now relied on to give the statute a construction which we have already said was forbidden by its own terms. Leaving out of the case the want of authority in the

treaty-making power to construe statutes for the courts, and the improbability that the senate would attempt in this mode to give a construction to the act of congress, it is clear that they did not intend to do this. They meant to say that this treaty shall not, by reason of its comprehensive terms in disposing of these lands, destroy existing rights. It recognizes existing laws, and, in the sale of these lands and disposal of the proceeds, existing laws shall be respected, if any exist, appropriating any part of these lands. But it certainly did not intend to declare what rights existed, or to construe statutes on which rights might depend, or to create rights in that regard which did not exist independent of the treaty.

As I have already expressed my clear conviction that the act of congress did not grant any of these lands, but. by express language excepted them out of the grant, I cannot give to this ambiguous phrase in the treaty, after conceding to it the meaning most favorable to defendants of which it is susceptible, the effect of creating a grant of these lands where none existed before.

These propositions, in my judgment, dispose of the case. They require that the patents issued by the United States for these lands be set aside, annulled and held for naught, and that the defendants be decreed to have no title in any of the lands in question, and perpetually enjoined from asserting such title.

DILLON, Circuit Judge. I fully concur in the conclusion reached in the foregoing opinion, and in the reasons advanced to support it.

Decree accordingly.

[The case was taken on an appeal to the supreme court, where the decree of this court was affirmed, Mr. Justice Field. Mr. Justice Swayne, and Mr. Justice Strong, dissenting. 92 U. S. 733.]